[Cite as *State v. Sanders*, 2019-Ohio-2566.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                           :

    Plaintiff-Appellee,           :

                                        No. 106744

    v.                            :

NAVI SANDERS,                            :

    Defendant-Appellant.          :

---

### JOURNAL ENTRY AND OPINION EN BANC

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** June 27, 2019

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-17-617652-B

---

*Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Katherine Mullin and Maxwell Martin, Assistant Prosecuting Attorneys, *for appellee.*

Rick L. Ferrara, *for appellant.*

RAYMOND C. HEADEN, J.:

{¶ 1} Pursuant to App.R. 26, Loc.App.R. 26, and *McFadden v. Cleveland State Univ.*, 120 Ohio St.3d 54, 2008-Ohio-4914, 896 N.E.2d 672, this court determined that a conflict existed between the original panel's decision in this case and this court's prior decision in *State v. Muniz*, 8th Dist. Cuyahoga No. 93528,

2010-Ohio-3720, regarding what must be proven to support a conviction for intimidation.

{¶ 2} In his motion for en banc consideration, the appellant also alleged that this court's prior decision presents a conflict with *State v. McLean*, 8th Dist. Cuyahoga No. 106293, 2018-Ohio-2232, and *State v. Teaque*, 8th Dist. Cuyahoga No. 106469, 2018-Ohio-3997, as to whether this court must conduct an allied-offense analysis and recognize plain error where the sentences for the alleged allied offenses were ordered to be served concurrently. We find no conflict here. The panel opinion does not conflict with *Teaque* because that case involved the merger of allied offenses where sentences were ordered to be served consecutively. Further, the panel opinion does not conflict with *McLean* because the Ohio Supreme Court has held that the recognition of plain error under Crim.R. 52(B) is discretionary. *State v. Barnes*, 94 Ohio St.3d 21, 2002-Ohio-68, 759 N.E.2d 1240. Therefore, the question presented is not a conflict of law but rather a divergence in the exercise of judicial discretion, and we decline to accept this issue for en banc resolution.

{¶ 3} Having applied the law adopted by the en banc court here on the issue of what must be proven to support an intimidation conviction, the panel opinion released November 15, 2018, stands as the decision of the court. The text of that opinion is appended to this en banc decision. We overrule all prior decisions of this court inconsistent with our holding here.

{¶ 4} It is the opinion of the en banc court that the fact that an underlying criminal or delinquent act occurred is not an essential element of the crime of intimidation of a witness.

{¶ 5} R.C. 2921.04(B)(2) states that no person, knowingly and by force or threat of harm, "shall attempt to influence, intimidate, or hinder * * * [a] witness to a criminal or delinquent act by reason of the person being a witness to that act[.]" In this context, a "witness" means "any person who has or claims to have knowledge concerning a fact or facts concerning a criminal or delinquent act, whether or not criminal or delinquent child charges are actually filed." R.C. 2921.04(E).

{¶ 6} "The purpose of an indictment is to inform the accused of the crime with which he is charged. The indictment, therefore, provides notice to the defendant of the charges against him so that he may prepare a defense." *State v. Benitez*, 8th Dist. Cuyahoga No. 98930, 2013-Ohio-2334, ¶ 11, quoting *State v. Davis*, 8th Dist. Cuyahoga No. 61076, 1992 Ohio App. LEXIS 4754, 2 (Sept. 17, 1992).

{¶ 7} In *Muniz*, 8th Dist. Cuyahoga No. 93528, 2010-Ohio-3720, the defendant was charged with intimidation of a crime victim in violation of R.C. 2921.04(B). The indictment in *Muniz* made no mention of the underlying offense. Further, a review of the facts in that case shows that it was not clear that an underlying criminal act had occurred, let alone the nature of such a criminal act. The court in *Muniz* was concerned with the due process implications of the defendant not being given adequate notice of the charges she faced. In light of this

concern, the court in *Muniz* found the state's failure to give notice of the underlying predicate acts in the indictment rendered it defective from the outset.

{¶ 8} Nothing in this en banc opinion shall be construed to undermine the holding of *Muniz* with respect to notice requirements. We maintain that a defendant is entitled to adequate notice of the crimes against which they must defend themself.

{¶ 9} A charge of intimidation does not require a conviction on the underlying offense. Had that been the legislature's intent, it could easily have used the words "criminal conviction" or "delinquent adjudication" rather than "criminal or delinquent act." Instead, the state need only prove that the intimidation victim had knowledge about a fact or facts concerning the underlying criminal or delinquent act, and that the defendant knowingly and by force or threat of harm intimidated the victim because of the victim's knowledge of facts concerning the matter. While a defendant must be apprised of the nature of the underlying criminal or delinquent act, that act is not a separate element of the offense that must be proven beyond a reasonable doubt. In holding that the occurrence of the underlying act is an essential element of intimidation, this court imposed an unworkable burden on the state. In making a case for intimidation, a prosecutor is not required to establish beyond a reasonable doubt that the predicate act occurred. Such a requirement, particularly in cases where the underlying offense may have been committed by someone other than the defendant in the intimidation case, would require a trial within a trial that we do not believe was intended or contemplated by the legislature in enacting R.C. 2921.04.

{¶ 10} We hold that the occurrence of the underlying criminal or delinquent act is not an essential element of the offense of intimidation that must be proven beyond a reasonable doubt. To the extent that our decision in *Muniz,* 8th Dist. Cuyahoga No. 93528, 2010-Ohio-3720, is inconsistent with this holding, it is overruled.

_____
RAYMOND C. HEADEN, JUDGE

MARY EILEEN KILBANE, A.J., PATRICIA ANN BLACKMON, MARY J. BOYLE, FRANK D. CELEBREZZE, JR., EILEEN A. GALLAGHER, EILEEN T. GALLAGHER, SEAN C. GALLAGHER, LARRY A. JONES, SR., KATHLEEN ANN KEOUGH, ANITA LASTER MAYS, and MICHELLE J. SHEEHAN, JJ., CONCUR

*State v. Sanders,* 8th Dist. Cuyahoga No. 106744, 2018-Ohio-4603 (panel decision journalized November 15, 2018):

MELODY J. STEWART, J.:

{¶ 1}  A jury found defendant-appellant Navi Sanders guilty of felonious assault, discharging a firearm near a prohibited premises, improper handling of a firearm in a motor vehicle, and intimidation of a crime witness.  The charges stemmed from the death of a 14-year-old child who was stabbed while sleeping in the same house where Sanders and her boyfriend, Jacque Renode, were staying.  Just days after the stabbing, Sanders and Renode were seen in the back seat of a car moving down the same street where the stabbing occurred.  Renode fired several shots from the car in the direction of a teenage victim, who had been present in the house where the stabbing occurred, and later heard Sanders and Renode make incriminating statements about the stabbing.  The state theorized that Renode murdered the child, and that Sanders was complicit in intimidating the victim from assisting the police investigation.  Sanders raises a number of assignments of error relating to evidence supporting the firearm specifications, the weight of evidence, the jury instructions on intimidation, prosecutorial misconduct, the assistance of trial counsel, and whether certain sentences should have merged.

I. Intimidation of a Witness

{¶ 2}  The intimidation count charged Sanders with intimidating a witness to a murder.  Sanders maintains that the state did not prove that the child's death

was the result of murder, nor did it prove who committed the murder. She argues that because Renode had been charged with the child's murder, but had yet to be tried, the court allowed the jury to assume that Renode murdered the child. She maintains that this assumption was a failure of proof on the intimidation count and otherwise tainted her ability to receive a fair trial.

A. Sufficiency of the Evidence

{¶ 3} Count 5 of the indictment charged Sanders with intimidation in violation of R.C. 2921.04(B)(2). That section states that no person, knowingly and by force or threat of harm, "shall attempt to influence, intimidate, or hinder * * * [a] witness to a criminal or delinquent act by reason of the person being a witness to that act[.]" In this context, a "witness" means "any person who has or claims to have knowledge concerning a fact or facts concerning a criminal or delinquent act, whether or not criminal or delinquent child charges are actually filed." R.C. 2921.04(E).

{¶ 4} The intimidation charge did not require the state to prove beyond a reasonable doubt that a murder occurred, much less who committed the murder. Had that been the legislature's intent, it could easily have used the words "criminal conviction" or "delinquent adjudication" rather than "criminal or delinquent act." The state only had to prove that the victim had knowledge about a fact or facts concerning the child's death and that Sanders knowingly and by force or threat of harm intimidated the victim because of the victim's knowledge of facts concerning the matter. As charged in the indictment, the to-wit clause referencing murder

applied merely to describe the circumstances of the criminal act; the precise nature of the criminal act was not a separate element of proof for the offense of intimidation.

{¶ 5} The evidence showed that the victim of the intimidation count, who was 13 years of age at the time, slept at the house where the stabbing occurred. He testified that after family members found the child, he personally saw the child on a bedroom floor, wrapped in a quilt and bleeding (the child had been stabbed in the neck). The child's mother told the victim to go to a local grocery store and locate her fiancé. The victim found the fiancé with Sanders and Renode. After the victim said that the child "was bleeding" and might be dead, the fiancé and Renode started running to the house, but Sanders only walked, telling the victim that the child was "not dead, he's okay." When they returned to the house, Renode went to the bedroom, but Sanders remained outside. The child testified that Renode then came out of the bedroom "really quick and said I have to get out of here * * *."

{¶ 6} Trial testimony established that Sanders and Renode had previously stayed at the mother's house, but were told to move out after "a bunch of altercations" with her children. As she was moving out, Sanders told the mother that "I'll be back and I'm going to kill you and your kids." Sanders and Renode returned to the house a few weeks later, claiming that they were homeless and needed a place to stay. The mother took them in as an act of charity. Two days later, the mother became upset after discovering that Renode had given an alcoholic drink to the child. After sending the child to bed, the mother, her fiancé, Sanders, and

Renode watched a movie. The mother checked on the child and found him sleeping on the floor, so she told Sanders and Renode that they could sleep in the child's bed. When the mother checked on the child two hours later, she found the child wrapped in a quilt and bleeding from a stab wound to the neck. Sanders and Renode were no longer in the house. The day after the child's death, the mother's fiancé found a pair of blood-soaked pants belonging to Renode in a clothes pile in one of the bedrooms.

{¶ 7} The child's mother testified that in the days following the stabbing, Renode's name was mentioned most frequently in speculation about who killed her son, given that bloody pants belonging to Renode were found in the house. Four days after the stabbing, the victim and his girlfriend were walking down the street where the stabbing occurred. They saw a car driving slowly down the street, with Renode and Sanders in the back seat. Renode, sitting behind the driver, extended a gun out the car window and fired about six times. Two bullets struck a vehicle next to where the victim was standing. The car then sped away.

{¶ 8} The state offered no expert testimony on the cause of the child's death, nor did it offer any evidence in the form of police testimony regarding an investigation into the child's death. Nevertheless, the jury could reasonably infer that the child, having been stabbed in the neck and wrapped in a quilt, died as result of foul play that rose to the level of a criminal act. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (it is "the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts").

{¶ 9} Evidence that Renode and Sanders may have been involved in the child's death provided a motive for intimidation. The victim testified that Renode and Sanders both made incriminating statements on the night of the child's death. And the discovery of Renode's bloody pants appeared to tie him to the death. These background facts put into perspective the victim's testimony that the car in which Sanders and Renode were traveling slowly down the street slowed down and that Renode fired multiple shots at him. A rational trier of fact could have found the shooting to be an act to intimidate the victim from testifying in a future criminal proceeding related to the child's death. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. The facts support that the shots were intended to injure the victim and/or intimidate him. There is no evidence of any other plausible explanation for the shooting.

{¶ 10} In addition to the direct evidence of intimidation, the jury could rationally find that Sanders fled the jurisdiction with Renode, an act that showed a consciousness of guilt. *State v. Eaton*, 19 Ohio St.2d 145, 249 N.E.2d 897 (1969), paragraph six of the syllabus ("Flight from justice * * * may be indicative of a consciousness of guilt."). Testimony showed that warrants were issued for the arrest of Sanders and Renode just days after the shooting. It is unclear when the two left Ohio, but Renode was forcibly apprehended six months later in Indiana.

{¶ 11} Although there was no evidence that Sanders fired the shots at the victim, a rational trier of fact could find Sanders complicit in intimidating the victim; that is, that she acted with the kind of culpability required for the commission of the

offense and she aided and abetted Renode. *See* R.C. 2923.03(A). Aiding and abetting can be inferred by presence, companionship, and conduct before and after the offense is committed. *State v. Johnson*, 93 Ohio St.3d 240, 245, 754 N.E.2d 796 (2001). Evidence that Sanders and Renode were together on the night the child died, along with incriminating statements both she and Renode later made, shows that Sanders would have benefitted just as much as Renode by intimidating the victim. This self-interest and companionship was sufficient evidence from which the jury could infer that Sanders was complicit in committing intimidation.

{¶ 12} For the same reasons, we reject Sanders's argument that the state failed to offer evidence sufficient to prove the firearm specifications attached to Counts 2 through 4 of the indictment. Those counts — felonious assault, discharge of a firearm near prohibited premises, and improper handling of a firearm in an automobile — were related to the intimidation count in that they pertained to conduct that occurred inside the car at the same time as the intimidation count (which did not contain a firearm specification). The culpability that Sanders had in intimidating the victim was applicable to the firearm specifications. *State v. Chapman*, 21 Ohio St.3d 41, 42-43, 487 N.E.2d 566 (1986); *State v. Rucker*, 8th Dist. Cuyahoga No. 105628, 2018-Ohio-1832, ¶ 43. The only remaining question is whether a rational trier of fact could find that Renode fired shots from the car, thus establishing the operability of the handgun. *See State v. Murphy*, 49 Ohio St.3d 206, 206, 551 N.E.2d 932 (1990), syllabus. The victim gave testimony which, when viewed most favorably to the state, established that Renode fired the gun from the

moving car. The jury could rationally find Sanders was subject to a firearm specification because she aided and abetted Renode.

B. Unfair Trial

{¶ 13} Sanders next makes a broader argument that the court should have granted a mistrial because of repeated statements by the mother, and assertions by the state that Renode murdered the child.

{¶ 14} Our discussion of Sanders's argument relating to the sufficiency of the evidence informs the present argument — because the state had to prove that the victim had been a "witness" to a criminal act (that is, the child had knowledge concerning a fact or facts concerning a criminal act), it necessarily had to provide context for Sanders's belief that the victim had been a witness to a criminal act. *See State v. Skatzes,* 104 Ohio St.3d 195, 2004-Ohio-6391, 819 N.E.2d 215, ¶ 216. The mother thus gave relevant testimony about the circumstances of her child's death.

{¶ 15} It is true that the state told the jury in its opening statement that the child "was murdered in his bedroom, his throat was slashed, by Jacque Renode, by Navi Sanders'[s] boyfriend," but this was irrelevant. This statement was not evidence — nothing said in an opening statement is considered evidence. *State v. Tenace,* 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 48. What mattered was that the state prove that Sanders was complicit in intimidating a witness who had knowledge concerning a fact or facts about a criminal act. The jury could have drawn different conclusions on whether the child died as result of murder or some

other criminal homicide.   We thus conclude that the court did not abuse its discretion by denying Sanders's motion for a mistrial.

## C.  Jury Instructions

{¶ 16}  Although defense counsel stated that he had no objection to the jury instructions, Sanders now claims plain error because the instructions for the offense of intimidation did not require the jury to find beyond a reasonable doubt that the child had been murdered.  Sanders also complains that the jury instruction failed to list any of the required elements of murder.

{¶ 17}  We summarily reject the argument that the jury instructions were erroneous based on our discussion in Part I(A) of this opinion.  The state did not have to prove beyond a reasonable doubt that a murder occurred; it only had to prove that Sanders subjectively believed that the victim had knowledge concerning the stabbing and that Sanders was complicit with Renode in firing shots at the victim in order to intimidate him.

{¶ 18}  Because the jury instructions were not plainly erroneous, defense counsel's failure to object to them did not deprive Sanders of her constitutional right to the effective assistance of counsel.   *State v. Delawder*, 4th Dist. Scioto No. 10CA3344, 2012-Ohio-1923, ¶ 4 ("counsel had no duty to object to an appropriate instruction").

## II. Manifest Weight

{¶ 19}  Sanders asks us to independently weigh the evidence and conclude that testimony by the child's mother was completely fabricated because she testified,

in seeming contradiction to the victim, that the victim claimed to have seen Sanders and Renode in the car, with a gun in Renode's hand, claiming that he would "come back and kill you and your family, your mother, as well as [the child's] * * * family."

{¶ 20} Although the victim testified and denied hearing any voices coming from the car, that contradiction did not call the verdict into question. The victim plainly identified both Sanders and Renode, an identification that was credible because of his familiarity with them and interaction with them on the night the child died. This familiarity mitigated concerns about any inconsistencies in portions of the witnesses' testimony.

{¶ 21} In addition to the strength of the victim's identification, other evidence made for a strong circumstantial case against Sanders. Renode and Sanders left the house at some point before the mother discovered that her son had been stabbed. When the victim later found Sanders and Renode and told them that the child was bleeding, Sanders replied that the child was not dead and that he would be "okay." The jury could have viewed the affirmative nature of that statement as indicating that Sanders had some prior knowledge of what transpired with the child. Renode's rapid departure after seeing the child's condition ("I have to get out of here") suggested a consciousness of guilt. By returning to the area where the stabbing occurred and shooting at the victim who had knowledge of statements made by both Sanders and Renode in connection with the stabbing, the act of firing shots at the victim could be viewed as an attempt to intimidate him into silence. Even more indicative of a consciousness of guilt was evidence that Sanders and

Renode left the state as warrants were issued for their arrest in the course of the investigation into the child's death. They were arrested six months later, under circumstances in which Renode had to be apprehended with the use of force.

{¶ 22} There were, as in many criminal cases, inconsistencies in how witnesses testified. It was for the jury to "believe or disbelieve any witness or accept part of what a witness says and reject the rest." *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964). This is not the exceptional case where the evidence weighs heavily against conviction. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

III. Prosecutorial Misconduct

{¶ 23} Sanders complains that the state engaged in misconduct by referring to the child's death as a "murder" without actually proving that the child died as a result of a homicide. She also complains that the state improperly referenced facts not in evidence and vouched for the credibility of its witnesses.

{¶ 24} For reasons previously stated, we reject Sanders's argument that the state improperly referred to the child's death as the result of a "murder" while examining witnesses. In any event, referring to the child's death as a "murder" was acceptable as a euphemism for "foul play" in this particular case and a fair characterization of the evidence based on unrebutted testimony that the child died after being stabbed in the neck while seemingly asleep. There was no rational basis to believe that the child died as a result of any accident, particularly when he had been wrapped in a quilt, possibly to hide his injuries.

{¶ 25} Sanders's next argument references testimony by the victim's girlfriend that she saw a text message from the mother's fiancé stating that "I know what happened that night." This text message came to light during trial, and, after the girlfriend had testified for the state, Sanders recalled the girlfriend as a witness. During Sanders's closing argument, defense counsel referenced the girlfriend's testimony and questioned why she had not been contacted by police detectives until the eve of trial. In response to defense counsel's assertion that the police did not contact the girlfriend, the assistant prosecuting attorney stated: "So [defense counsel] says that [the girlfriend] wasn't contacted. I think you'll remember the testimony was that her mother did not want her to be a part of this. But we did find her in time for trial. Again he wants you to trust her but ignore her honest and deep-held belief that defendant was in that car." Defense counsel objected, and the court sustained the objection. Sanders now argues that the state improperly vouched for the truthfulness of its own witness.

{¶ 26} "It is improper for an attorney to express his or her personal belief or opinion as to the credibility of a witness or as to the guilt of the accused." *State v. Williams*, 79 Ohio St.3d 1, 12, 679 N.E.2d 646 (1997). By charactering the girlfriend's belief that Sanders was in the car as "honest," the state arguably expressed an opinion on her credibility. Nevertheless, the court sustained Sanders's objection and later instructed the jury that closing arguments were not evidence and that the jury should not speculate on why the court sustained any objection. This

limited the potential for prejudice from any misconduct. *State v. Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, ¶ 250, 253.

{¶ 27} In a different part of its closing argument, the state noted that Sanders's attempt to intimidate the witnesses did not stop those witnesses from coming to court and "telling you the truth." Sanders did not object to this statement, so she forfeited all but plain error. *Dean* at ¶ 237. Unlike the state's statement that the girlfriend was "honest," the statement that the witnesses came to court for the purpose of "telling you the truth" did not vouch for the credibility of any specific statement. There is enough difference in the semantic content of the statement that it did not vouch for the witness's credibility and rise to the level of plain error.

IV. Allied Offenses

{¶ 28} For her final assignment of error, Sanders maintains that the sentences for felonious assault, improper handling of a firearm in a motor vehicle, and discharge of a firearm near a prohibited premises should have merged because they all occurred simultaneously.

{¶ 29} During sentencing, the court referenced all of the counts on which the jury returned a guilty verdict and stated, "[i]t's my understanding that none of those counts would merge for purposes of sentencing; is that correct?" The state replied, "yes"; defense counsel said nothing. By failing to object, Sanders forfeited all but plain error. *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 21.

{¶ 30} Even if some plain error in failing to merge the sentences occurred, an appellate court is not obligated to reverse. The application of the plain error doctrine should only be applied "'under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *Id.* at ¶ 23, quoting *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus. The court imposed a total 15-year sentence on the felonious assault count, including mandatory consecutive time for three- and five-year firearm specifications. The sentences for the remaining counts were ordered to be served concurrently. The order of concurrent service means that recognition of plain error would not affect the length of Sanders's sentence. No manifest miscarriage of justice would occur if the counts were not merged.

{¶ 31} Judgment affirmed.